This is Judge Easterbrook. I will be participating as a voice only in these cases. We are ready for argument in our first case this morning, Schmucker v. Johnson Controls. Mr. Barnard. Thank you, Judge Easterbrook, and may it please the Court. This case involves a neighborhood's ongoing exposure to trichloroethylene, a genotoxic known human carcinogen from a plume that's been there for over 30 years, and plaintiff's ability to enforce RCRA's closure and endangerment standards. The plaintiff's ability to enforce what? RCRA's closure. Could you use English words, please? Yes, Your Honor. The Resource Conservation and Recovery Act. You will find that we are generalists rather than specialists, and using jargon that works only with specialists does not take real well with generalists. Thank you, Your Honor. I was referring to the Resource Conservation and Recovery Act, and there is a term that I have to use because it's very unique and very appropriate for this argument in our case, and that's closure. Closure is a specific regulated activity that I will get to here in just a moment. And then the endangerment standard is the second concept that is important to our citizen suit provision today. Mr. Barnard, forgive me, this is Judge Rovner. Yes, Judge. I, with, you mentioned closure, and with respect to the Subject A claim, one threshold point that Judge DiGiulio made was that the closure process is meant to control, minimize, or eliminate, to the extent necessary, the post-closure escape of hazardous waste. And there is a separate corrective process to address offsite contamination that has already has not taken the steps necessary to stop the continued escape of TCE from the former manufacturing site. Your Honor, the concept of closure and the very purpose of the closure performance standard that uses post-closure, it's built on a concept, a premise, that you either, at closure, you have two options. You either contain it all like a landfill, you encapsulate it, you cap it, or, and we know that didn't happen, so the only other option is clean closure. And it's very clear in the regulations and in EPA's closure guidance that clean closure means clean. It means you remove all of that contamination. And so when the regulation talks about post-closure release, it's a concept that you've already contained it, so you can have no further migration or potential human exposure. Here, Johnson Controls did neither. And the undisputed evidence is that, from Johnson Controls' own consultants, was that the TCE that was stored in this unit was allowed to leak through the soil all the way to the groundwater and then into the client's neighborhood. That was a closure that needed to be addressed at the time of closure. The corrective action concept applies to releases from every other location other than a closure. And so when the court applied the closure performance standard, the court below applied it only to this arbitrary one and a half feet that IDEM agreed could be excavated. And yet the evidence was... Is that who? You've used another initialism as if it were a word, and it really isn't. I apologize. It's the Indiana Department of Environmental Management. That's our state agency. And they agreed to compromise. It's very simple to say things like the act and the agency. I apologize, Your Honor. I will use my best efforts to use no further acronyms. I apologize. It's not even an acronym. It's an initialism. That is, it's not something you can say as a word. Mr. Barnard, what standard that has become effective under the act is the defendant violating now? Well, two. They're violating, for the A1A claim, they're in violation of the closure regulations. Which? Which is 265.111. How are they violating? I'm looking at, in particular, the language controls or minimizes to the extent necessary to protect human health and the environment. That's not a zero tolerance standard. So how are they violating that standard? Well, as described by EPA and by the Environmental Protection Agency, in their closure memorandum, they explain that the premise of clean closure is to remove all contaminants. And if you don't, you've got to meet an established... Sorry, sorry. A memorandum from the EPA? Yes. I've got two questions about that. Is that the one that was being raised for the first time on appeal? And is it legally binding? Well, it was discussed in detail for the first time in our appellate brief, yes. It was a link in the EPA website that we had cited at the summary judgment stage. Which also says, the EPA website says that all surrounding soils that are contaminated must be removed at the time of closure. Mr. Barnard, let me be more pointed about this. I'm not interested really in advice that EPA offers here. Your claim is that there is a legal violation, and I'm looking for a specific standard that is being violated. Well, the off-site groundwater contains trichloroethylene at levels that are hundreds of times above the maximum contaminant level, and that is not protective of health. So the legal standard is to the extent necessary to protect human health and the environment. And when you have contamination that was emanated from this storage unit, that... Counsel, I'm worried about the same thing Judge Hamilton is worried about. That is, you're relying on a memo issued by the EPA. But so far as I can see, the statute, 1A, refers to permit, standard, regulation, condition, requirement, prohibition, or order. It doesn't say memo. The memo doesn't appear to be any one of those because it wasn't issued after notice and comment. So the question I have, which Judge Hamilton asked and you haven't yet answered, is what status this memo has that would bring it within the statutory language? Your Honor, I think it has been... These types of guidances from EPA have been referred to by the other circuit courts as useful guideposts. Is... Could I persuade you to address the statutory language? Yes. Your Honor, the meaning of 265.111 has to be read in the context of what type of closure. Could I persuade you to address the statutory language? Well, the statutory language is the right to bring a claim based on any violation of any regulation. We believe that this... Yes. And this regulation... So is this memo a regulation? That is, was it issued after notice and opportunity for comment under the Applicable Administrative Procedure Act? No, it was not. All right. So it's not a regulation. What other word of the statute does it meet? Well, we took the deposition, Your Honor, on this very issue of what does this regulation mean to the extent necessary to protect human health. That was the whole purpose of our deposition. You just called it a regulation, and you've already conceded that it's not a regulation. My question is, what other word of the statute does this memo meet? And that question can't be answered by referring to what somebody said at a deposition. It has to be referred to the language of the statute. Well, Your Honor, I am referring... With all due respect, I think I'm referring to the regulation. And the regulation is 265.111. And it requires every closure to be done in a manner that protects human health. We asked the regulator in a 30B6 deposition, what does that regulation mean? And he said, you've got to remediate the groundwater, the off-site groundwater, to the drinking water standard. Right now, the drinking water standard is hundreds of times higher than as required through the agencies, the agency that is overseeing. Are any, Mr. Barnard, are any humans exposed to that groundwater? Not directly, Your Honor, but they're exposed to the vapors that are being generated by that groundwater. So let me try to cut to the chase since time is short here, Mr. Barnard. I'll just go ahead and tell you and my colleagues and Mr. Hall that I have considerable skepticism about the district judge's collateral attack rationale for dismissing your A1A claim. But given the outcome of the trial on your A1B claim, the endangerment claim, if we were to affirm those findings, is there any way that you could prevail on your A1A violation claim? Yes, Your Honor. We could prevail by explaining and providing the evidence that we have that the groundwater and the soil has not been remediated to levels that are, according to the regulation, that are necessary to protect health and the environment. That has not been done. How is that consistent with the district judge's findings that there is no substantial or imminent endangerment here? Well, I would make two responses. Number one, there's no requirement under A1A for proof of imminent and substantial endangerment. Isn't it kind of the opposite, though, of protecting human health? Well, I'm not sure that I would say it's the opposite. I think and even in the court's decision, I believe he said this is a less protective standard when he was describing the EPA's ability to enforce the language necessary to protect human health. But number two, on the imminent and substantial endangerment provision, again, we don't believe that there has been there's been there's no court in the country that has held that actual exposure to a known human carcinogen is not an endangerment. And so the fact that this groundwater continues to generate vapors of this human carcinogen beneath a residential neighborhood, we believe would meet both. We believe it does meet both the endangerment standard as well as the A1A standard necessarily. Your Honor, if you're going to ask a question, I'd be happy. I really want to entertain questions, but I also am looking at the clock and I think I have close to my six minutes for rebuttal. Mr. Barnett, I did want to ask you fairly specifically, as I understand it, you're not challenging any factual findings by the district court. That's right. And I wanted to direct your attention to the post-trial findings where the district judge was page 50 of that opinion, short appendix 110, note 27. The district judge wrote that assuming 10 people spent their entire lives inside of each of 16 homes, such that 160 people were exposed to a one in a million risk, there is still a greater than 99.98 percent chance that the risk would not materialize. Do you agree or disagree with that point? I don't disagree with the substance, but I believe that what the court is doing in that situation is quantifying the risk, which as we understand the standard, is not required. Maybe it's not required, but isn't he permitted to look at it that way? Well, I can't say he's not permitted to look at it that way when you have actual exposures, but I don't believe that that analysis carries the day on an endangerment standard when cases like Cox v. City of Dallas, our Fifth Circuit case that was just embraced by this circuit, recognize that an endangerment exists before people are exposed. You don't wait until people are exposed, and that way you don't need to quantify that risk. So we believe the endangerment in this case began at the time that the TCE was released into the neighborhood. I needed to ask you about one other point, Mr. Barnard. On the next page of the District Court's opinion, he noted that your expert, Dr. Orris, said that the levels of exposure to TCE here are comparable to common background levels. Is that correct? Well, Your Honor, it's correct. That is the answer he gave, but it's not correct with respect to the evidence in this case. We pointed out in our brief that 96 background samples were taken in this neighborhood, and only three of those 96 had any TCE, and the highest level of background was 0.17. So that's the appendix, the supplemental appendix, pages 49 through 57. And the fact that, yes, and I think one last point, and then I'll reserve my time for rebuttal. The fact that some people may be exposed to TCE if they live in an urban environment, I don't think is a factor when the company that leaked the TCE and is allowing that to migrate into their homes from subsurface is exposing them to additional TCE. I have a very quick question. Does the record include anything as a practical matter? If people living on the plume can sell their houses? Your Honor, I'm sorry, I didn't catch the first three words of your sentence. As a practical matter, can people living on the plume sell their house? Your Honor, as a practical matter, I think it's difficult because there is now a radon mitigation system underneath these houses with large tubes extending to the roof line, and that needs to be explained to a potential buyer that there's a vapor mitigation problem, a vapor problem in that neighborhood. So it's certainly not desirable. Thank you. I'll reserve the rest of my time for rebuttal. Thank you, Your Honors. Thank you, Mr. Barnard. Mr. Hall. I may please the court, Thomas Hall, on behalf of the Pelley Johnson Controls. Turning first to the section 6972A1A claim, district court properly noted the two false premises in the homeowner's claim. One is they asserted that all closure under the Resource Take Place at the time the waste management units themselves are shut down and closed. That is simply incorrect. The remediation can continue as it is here. Secondly, the district court properly found that it is up to the state regulator here to determine what the closing does not authorize a private citizen to ask the court to establish that criteria preemptively before the regulator has established it. Why on earth not? I frankly don't understand the district judge's collateral attack on closure theory. I don't see where that comes from the statute about citizen suits. Your Honor, I'll walk you through it. What we're talking about is the standard for closure in 40 CFR 265.111, which requires closure in a certain fashion. That's the general criteria for closure. 265.112 requires that the closure plan to be submitted and there will be a closure plan in connection with the voluntary remediation. Mr. Hall, let me walk you through my concerns. I'm familiar with the statutes. What I don't understand is, first of all, under your theory, it seems like closure could take forever here. And the affected citizens would never have an opportunity to be heard on those questions. Maybe I'm wrong about that. I'll be interested in your response. But I also don't understand, given the Congress's specific provisions in the statutes about when citizen suits may and may not be brought, where this collateral attack theory comes in and what the bar is to the theory. Let's suppose plaintiffs can show a specific that the conditions are in violation of specific environmental provisions. Why can't they bring that suit now? Or in 2014? You have to look at the provision, Your Honor. Let me back up. Please direct me to the controlling language. The initial closure that took place was the waste management units themselves. 265.111 goes to that. That is cleaning out the storage units, shutting them down, and make sure everything is clean. As the district court found, what we're doing now is remediating off-site contamination. And 265.111 addresses post-closing releases from the waste management units themselves. That's not what we're talking about. Okay. So you're remediating off-site. You're not under, as near as I can tell, any court order to do so. You're doing it through an agreement with the state agency that the neighbors are unhappy with. They think they're being too soft on you guys. What stops the citizen suit? Several things, Your Honor. Number one, they're suing to enforce 265.111, which narrowly applies to post-closure releases. That's an argument that they should lose on the merits. And I understand that argument. I don't understand why they aren't entitled to sue. Because the 265.112 gives the state regulator here the authority to review compliance with 111, to assure that the closure plan complies with 111, and to enforce that. So let me try again. I'm going to try one more time. Can you point me to language in 6972, the statute, that prohibits this A1A claim? It doesn't prohibit it, Your Honor, but it oversteps the bounds of the discretion of the regulator. I'm sorry? Where the statute gives the regulator— The discretion of the regulator, that's what the citizen suit is supposed to control. But the regulator has not set, has not exercised its discretion yet as to what the off-site cleanup letter should be. How long are the neighbors supposed to wait? Well, I could explain why these things take so long, Your Honor. But, you know, you can't establish the off-site— The court recognized that risk-based disclosure is perfectly permissible. That requires the exercise of discretion. The court recognized there were different types of closures, there were different risks analyzed, and that the regulator here must assess all those factors. We're not yet at the point where that can be done. We're not at the point where we could see how clean we can get it, what risks are remaining, and how can we mitigate those risks to achieve closure. So, under your theory, how long would a neighbor who is not satisfied with the closure plans or your remediation efforts have to wait before going to court? Well, going to court in different ways. Under A1A, they would have to wait. If they're challenging the off-site closure levels, they have to wait for the regulator to set those. Then they can challenge them if they're not satisfied. Number two, they have a right as they did under A1B, if there's an intimate substantial endangerment, which they pursued. Lastly, they would have a right under 6972A2 to sue the regulator for failure to act. Now, it doesn't apply to discretionary acts, but if the regulator completely abandoned its obligations here and did nothing, presumably that's nondiscretionary. And under 6972A2, a private citizen can sue the regulator here to move forward and enforce RCRA. So, there are available options. Judge Rogner has been trying to get in. Please, Judge Rogner. Well, thank you so much, Judge Easterbrook. Mr. Hall, finish your thought, and then I will ask you a sub-question, a claim question. My answer to Judge Hamilton's question is there are statutory bases for claims that do not have to do with the regulator. Counsel, I invited Judge Rogner to ask a question. You will address her question. Judge Rogner, please proceed. A section B claim question with respect to the various state and federal screening levels for EPA screening. If we're talking about which screening standard is relevant, why doesn't the federal EPA screening level control? And if it does, why don't the two indoor air test results that were above the EPA level suffice to show an imminent and substantial endangerment? There are several answers, Your Honor. First, the screening levels, case law routinely recognizes, are not dispositive, whether it's state, federal, or something else. And obviously, the judge analyzed those screening levels here. Secondly, completely devoid of the discussion here of screening levels or other factors such as duration, the EPA screening level of 0.48 is based on a lifetime of exposure, 70 years, 24-7. That standard does not come anywhere close and is not predicted to come anywhere close here. So if you just isolate and say, well, in 2019, there was one exceedance to EPA screening levels, that doesn't really tell you a whole lot, Judge, without considering a lot of other factors. I think the cases that the homeowners cite on the A1A claim are really consistent with our argument that it's not until the regulator sets the closing criteria that a private citizen has a cause of action. In the Atkins case, for example, there, the administrative regulator imposed certain requirements on the facility, and they were violated. The regulator sued to enforce only a handful of those. A private citizen stepped in and sued to enforce the rest, and the court concluded that was perfectly appropriate because there, the regulator had imposed that criteria, and the private citizen was not trying to usurp the discretion of the administrator. And it's the same for the clean air cases that are cited in the reply brief. There, the regulator imposed requirements in air permits, and it's when those requirements were not met that the private citizen had a private cause of action. I would like to follow up on Judge Hamilton for a moment on the subsection A claim. Is there any time frame under which the plaintiffs can expect that the groundwater contamination will be fully remediated? Well, we're moving in that direction, Your Honor, and I think it's unclear exactly where we'll get. So it's undetermined what the level will be, and it's undetermined what level we will achieve. I can tell you, if you look at the district court's trial decision, that when the remedy we're performing now, the enhanced reductive dechlorination, which is a bacteria-based cleanup, which basically decomposes the TCE in the ground, that where that is maturing, there are areas where the TCE levels in the groundwater have dropped to zero. So, you know, and that is spreading and that is ongoing. So I think it's premature to predict, you know, where we will end up, but we're certainly trying to do our best to clean up as much as scientifically possible. And I'd like to follow up on Judge Hamilton once more on the subsection A claim. When he granted summary judgment on the subsection A claim, Judge DiGiulio reasoned in part that entertaining this claim would amount to a collateral attack, okay, on the Indiana agency's regulated closure process. But it seems to me there could be any number of subsection A claims which might contest how a state agency has interpreted and applied a regulation, a standard, or even one of its own directives. Subsection A gives a plaintiff the right to ask a court to render its own judgment about what a regulation or order means and whether a party is in violation of it. So if you could explain to us why you think we should endorse Judge DiGiulio's rationale, it might be helpful. When he talked about collateral attack, he was talking about section 112 and 113, which gives the state regulator here the authority to approve, modify, or disapprove the ultimate closure plan. The ultimate closure plan will set forth the ground levels that we will aim to achieve. And what Judge DiGiulio found is that the statute gives item in the first instance the absolute discretion to set those standards. That's the basis for his holding. If those standards are not set, if we don't satisfy those standards, then a private citizen may then have a cause of action. But the judge found that the statute gives that discretion to the regulators who are in a much better position than presumably this court or I am or anyone else to establish those records, particularly when you're talking about risk-based closure, which is a very detailed and complex and scientific analysis. Let me turn to the A1B claim briefly. Judge DiGiulio properly decided that case post-trial based on a totality of the evidence. He did consider screening levels, which is perfectly appropriate. But he went on to say that he analyzed those in the context of testimony from epidemiological, medical, and toxicology experts. And he found that the evidence was toxicological experts. Most importantly here, as I mentioned, was the duration of current exposure. These 15 homes at issue were above item screening levels back in 2011. There were no tests done before that, so there's no evidence of any exposures before then. And then, as plaintiffs point out, several of the homes since then have shown isolated cases of exceedances, not of items level, but of the EPA level. There were two houses in 2019 that showed an exceedance of EPA's level, but not items level. But as I said, the screening levels are based on a lifetime of exposure. So it's an exposure out above its screening level for 70 years, 24-7, that potentially triggers some issue. And the duration here was far, far less than that. The two is the possibility of future exposure. Here, Judge DiGiulio found that the levels were being significantly reduced, that the risks were being mitigated, so he found no real evidence of potential future exposure. And then, of course, he considered the health risks at these various levels. The most importantly, consistent with this court's holding in Liebhardt, which said there must be accompanying evidence that establishes some connection between the existing contamination and some imminent and substantial endangerment, Judge DiGiulio significantly found that to be lacking here. He said they failed to establish that link between these levels and any risk. And that's because their expert, when he tried to make that connection, he relied on studies in which there was demonstrated health adverse effects from TCE exposure, but the exposure levels in those studies were hundreds and usually thousands of times higher than we have here. Mr. Hall, excuse me, but as I understand Judge DiGiulio's reasoning here, he was basically saying, look, the remediation steps seem to be working pretty well with the vapor control systems, the walls, the bacteria, etc. I'm not sure I understand them all yet. What happens if, let's say, Johnson Controls goes into bankruptcy? What happens to those efforts? Well, you know, that would depend on the bankruptcy process, of course, and where funds are expended. But the voluntary remediation program, they're correct. We can drop out of that. But then the regulator can bring an enforcement action against Johnson Controls. So there's certainly... Okay. I just, I've dealt with these issues before, for example, with General Motors in the aughts. And I think all of us were then surprised when a company like General Motors went into bankruptcy and left similarly situated homeowners high and dry. Is there any related state law litigation or anything, for example, here under nuisance law or any, to get to follow up on one of Judge Roedner's concerns, in essence, for drops in property values or the inability to sell? Yes. There is? Okay. There are two actions pending. Mr. Barnard's firm has brought both against Johnson Controls. One is in federal court alleging both personal injury and loss of property value. That is before Judge DiGiulio is at the summary judgment stage. And secondly, there's a group of separate homeowners who brought a similar action in Indiana State Court. So yes, those actions are moving forward, including for the potential of loss of property value. That's correct. Thank you. Thank you. Also, Judge Hamilton, you noted the footnote in Judge DiGiulio's decision about ambient air levels. And some of the evidence on that, and this was in Joint Exhibit 14, was that EPA did a study, 2011, I think, which went back a number of years. And it looked at TCE levels captured in air monitors around the country. And they concluded that the average at that time was 0.3 micrograms per cubic meter. Now, 0.3 is not that far off in the 0.48 EPA cancer screening level. And the EPA went on to say that indoor air levels of TCE are typically three times higher to that 0.9 micrograms per cubic meter, which is double the EPA screening level. So it kind of puts into context, I think, what these screening levels mean. And there was expert testimony by our expert that paints and solvents in a home alone can easily lead to a 2.0 level in homes, which is four times higher than the EPA cancer screening. And in fact, that was one of the homes that tested positively or above screening levels, EPA screening levels, in 2019. There was an expert opinion those were due to paints and solvents in the home. I see my time is up, unless the panel has any other questions. Thank you. Thank you, Mr. Hall. Anything further, Mr. Barnard? Yes, Your Honor. I'd like to make three brief points in my two minutes. First, 20 years has gone by since the purported closure took place. And I believe that Atkins case teaches us that homeowners do not have to wait any further. There is no statutory basis to preclude that suit. Number two, the regulator has, in this case, the regulator has set a cleanup level, contrary to counsel's argument. And you can look at docket 289-33, pages 41 through 44, where the regulator says that that cleanup level needs to be five. The regulator is just not enforcing it, which is the reason we brought this suit. You also look at docket 324-2, which is Johnson Control's answers to our interrogatories. We asked them, what type of closure do you maintain you achieved? And they said we achieved clean closure. And that's why we asked the item regulator, under this regulation, 265.111, when you do a clean closure, what is the number you have to reach? And he said five. So that number has been set. Our third point on A1B... Was that set in his deposition? Yes, Your Honor. And is that what's in 289-33 that you mentioned a moment ago? Is that... Yes, Your Honor. That's the Schultz deposition. Okay. Yes. But, Your Honor, also... I'm now lost. We're back to 1A, and the statute doesn't refer to statements in depositions as things that are enforceable. Well, again, we asked the regulator how the regulator enforces... Look, the statute says you have to be alleged to be in violation of a permit, standard, regulation, condition, requirement, prohibition, or order. Statements in depositions are just not on that list. There's no way around that. If there's some thing that is on the list that they're in violation of, please point that out. It's the words in the regulation, Your Honor, to the extent necessary to protect human health. That is the regulation. And we've asked... We're seeking to enforce a non-numeric regulation, which I believe that we are entitled to do. And I believe that the court can look at that language. And we asked, as evidence, we asked the regulator, how is that regulation enforced? And he said, if you don't achieve the drinking water standards, it's not protective of health. Yes. All right. Thank you very much, counsel. Yes, Your Honor. The case is taken under advisement.